**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| JANE MONTES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 12 C 2892 |
| v. | ) | |
| | ) | Judge Sara L. Ellis |
| CICERO PUBLIC SCHOOL DISTRICT NO. | ) | |
| 99, an Illinois school district, DONNA | ) | |
| ADAMIC, and MICHAEL DZIALLO, | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION AND ORDER

The Cicero Public School District No. 99 (the "District") employed Dr. Jane Montes, who is of Mexican national origin, as the English Language Learning ("ELL") Director, where Donna Adamic and Michael Dziallo (collectively with the District, "Defendants") supervised her. After the District did not renew her contract for the 2011-2012 academic year, Montes filed suit against the District for national origin and associational national origin discrimination in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*, and against Adamic and Dziallo for intentional interference with business expectancy. Defendants moved for summary judgment [134]. Because the Court finds issues of fact on Montes' discrimination claim, that claim must be tried by a jury. But because Montes could not have had a reasonable expectation of continued employment with the District, judgment is granted for Adamic and Dziallo on Montes' intentional interference with business expectancy claim.

# BACKGROUND[1]

The District, located in Cicero, Illinois, serves approximately 13,300 students. Of those students, approximately 90 to 95% are Hispanic and about 7,000 are ELL students. The District employs approximately 1,600 individuals, including 800 teachers, 200 program assistants, 70 to 80 administrators, and 100 clerical and support staff. Adamic was the District's Superintendent from July 1, 2008 through June 30, 2014, having previously served as a principal of one of the schools in the District as well as the District's Assistant Superintendent for Student Services and for Educational Services.[2] Dziallo served as the Assistant Superintendent for Educational Services for the District from July 1, 2008 through June 30, 2012, having previously served as a principal in the District.[3] Neither Adamic nor Dziallo are of Mexican national origin, and Dziallo testified he was not aware of Montes' national origin when they worked together at the District. Dziallo has a bachelor's degree in Spanish with a minor in Chicano studies, however. He does not hold a certification in bilingual education but has a Spanish endorsement. Before joining the District, Dziallo taught Spanish and coordinated bilingual education and ELL programs in other school districts.

The District employed Montes as its ELL Director from July 1, 2008 until June 30, 2011, entering into one-year contracts for each year of her employment with the District. Montes has a bachelor's degree in elementary education from Western Illinois University, a master's degree in

---

[1] The facts in this section are derived from the Joint Statement of Undisputed Material Facts, Montes' Statement of Additional Facts, and Defendants' Response to Montes' Statement of Additional Facts. The Court has included in this background section only those portions of the statements and responses that are appropriately presented, supported, and relevant to resolution of the pending motion for summary judgment. All facts are taken in the light most favorable to Montes, the non-movant.

[2] Adamic's contract with the District was not renewed in 2014.

[3] Dziallo resigned from the District effective June 30, 2012, having taken a position as the Superintendent of Westchester School District 92½.

bilingual/cross-cultural education from California State University, Sacramento, and a doctorate in education from the University of Illinois. She holds several certifications: a type 75 certification from the State of Illinois, allowing her to oversee a school budget, teacher evaluations, and other administrative tasks; a bilingual education and learning behavior K-9 certification from the State of Illinois; a problem-based learning certification from the State of Illinois; a special education certification; and a guided language acquisition design certification from the State of New Mexico. Montes belongs to the Illinois Association for Multilingual Multicultural Education, the Principals' Center at the Harvard Graduate School of Education, the National Association for Bilingual Education, the Illinois Principals' Association, and Phi Delta Kappa International.

As the ELL Director, Montes had the following responsibilities:

- Develop an organizational plan for delivery of [ELL] to eligible students based on ISBE regulations.
- Develop, write, coordinate and manage federal and state grants related to the [ELL] Department.[4]
- Develop and administer budgets for all programs related to [ELL].
- Devise and maintain program delivery reports and expenditure reports for all grants.
- Evaluate [the ELL] Program.
- Supervise [ELL] Program Supervisors, Bilingual, ESL teachers and support staff.
- Plan and/or conduct staff development for [ELL] department personnel.
- Recommend the adoption and use of instructional materials and textbooks for the delivery of service to ELLs.
- Attend or send a representative to required state and local meetings and committees that pertain to services and assessment for ELLs.

---

[4] For ELL grants, Montes was to be the primary author, but she also needed to obtain approval from the District's Business Manager, Assistant Superintendent of Finance and Operations, and Superintendent before grants were submitted to the Illinois State Board of Education ("ISBE").

- Collaborate with District administrators in determining and implementing current best practices and research for the appropriate programming for students.
- [P]erform any other duties assigned by the Assistant Superintendent for Educational Services.

Ex. T to Joint Stmt. at C#99Montes.000014.

Karen Mulattieri, who is also of Mexican national origin, immediately preceded Montes as the District's ELL Director. From May 2008 to January 21, 2011, she served as the District's Assistant Superintendent for Student Services.[5] Mulattieri had extensive experience with bilingual education, holding bilingual education approval from the State of Illinois and having been the division administrator for ELL, refugee programs, and migrant student programs for the ISBE.

When Mulattieri was the ELL Director, the ELL program was under the supervision of the Assistant Superintendent for Educational Services. When Mulattieri became the Assistant Superintendent for Student Services in May 2008, however, she requested that the program be transferred to her supervision.[6] This meant that she supervised most substantive academic programs. Specifically, in the 2010-2011 academic year, in addition to supervising Montes, Mulattieri supervised the following employees: Elsa Barios, Director of Math and Science; Vicky DeVylder, Director of Literacy; Joyce Hodan, Director of School Improvement and Federal Grants; Vicky Parkinson, Director of Special Education; and Diane Ulmer, Director of

---

[5] Mulattieri currently is the Officer for English Language Learning and the Officer of Language and Cultural Education for the Chicago Public Schools.

[6] Mulattieri testified this was because she had not found Dziallo, who had been appointed Assistant Superintendent of Education Services at the same time she became Assistant Superintendent of Student Services, to be the most cooperative principal in implementing ELL programs when she was the District's ELL Director. She accuses Dziallo of having unopened textbooks purchased for bilingual education at his school. Dziallo did not recall that textbooks were not opened and disagreed with Mulattieri's assessment of his views toward ELL programs. But this dispute is immaterial to the Court's resolution of the present motion for summary judgment.

Social Studies, Fine Arts, and the Gifted Program.  Of these, only Montes was of Mexican

national origin.  On the other hand, Dziallo, as the Assistant Superintendent of Educational

Services, had oversight over information services and security.  He also was responsible for

keeping all curriculum records, making all reports required by the Board and assigned by the

Superintendent, training staff in using the District's student database, and ensuring the accuracy

of that data.

In Montes' first evaluation for her performance during the 2008-2009 academic year,

Mulattieri found that Montes met professional standards and had no areas of unsatisfactory

performance.  Mulattieri further noted that Montes had a "willingness to learn and put[ ] forth a

great deal of effort on her own," was "a strong advocate for students and convey[ed] her beliefs

to the educational community," and had "a strong sense of consensus building and collaboration

with other programs and departments in order to maximize opportunities for students."  Ex. 7 to

Pl.'s Stmt. of Additional Facts at C#99Montes.000049.  Mulattieri did propose some areas of

growth, including training in fiscal management, prioritizing tasks, delegating tasks, increasing

knowledge of the ELL program, and better managing her clerical staff.  The next year, in March

2010, Mulattieri again found that Montes met professional standards and had no areas of

unsatisfactory performance.  This time, Mulattieri included no suggested areas of growth.

The District had to report certain data to the ISBE on its students and its ELL program.

In May or June 2010, upon reviewing the District's ELL data, Montes and Mulattieri determined

that the data reported by the District had not properly recorded approximately 700 to 1,000

students who were the most proficient in English.  Attempts to correct the error were not

successful.  The error meant that the ISBE considered the ELL program not to be meeting its

targets, requiring the District to create improvement plans. Mulattieri blamed the error on Dziallo.

Apparently in response to the data entry error, at the beginning of the 2010-2011 school year, the District changed the data entry process. The change resulted in transferring data entry and review to the ELL administrative staff, which meant that Montes and her two program supervisors were responsible for the task. Mulattieri did not agree with this decision, as she believed it took Montes away from her other responsibilities as ELL Director. Further, supervision of Montes with respect to this data component of her job fell to Dziallo.[7]

In addition to coping with the added data responsibilities, Montes faced other issues in her third year at the District. In October 2010, Adamic met with Mulattieri and Dziallo to discuss the possibility that Montes' contract would not be renewed for the following school year. Adamic asked Mulattieri to provide Montes with a list of goals for the year, something Mulattieri was not asked to do for any of her other supervisees. This was also despite the fact that Mulattieri did not have any issues with Montes' performance and was unsure why there was any discussion of Montes' contract not being renewed.

After the meeting with Adamic, Dziallo and Mulattieri met with Montes. Dziallo offered training support for the data issues. Mulattieri did not recall telling Montes that her contract may not be renewed, though she informed Montes that the situation was "serious" because it was Montes' third year in the District, which came with added expectations. Ex. G to Joint Stmt. at 134:9–16.

_____

[7] Although the parties do not argue that there was a formal transfer of supervision at this point from Mulattieri to Dziallo, incidentally, Montes' contract for the 2010-2011 academic year, unlike for the previous year, indicates that she was to be reviewed by the Assistant Superintendent for Educational Services, i.e. Dziallo.

As instructed, Mulattieri also provided Montes with a written plan for improvement. To create the plan, Mulattieri drew from Montes' prior evaluations, focusing on three main issues: budget, vision, and supervision of clerical staff. Mulattieri first listed several areas that she viewed to be Montes' strengths: "[c]lear communication style," "[g]ood presentation skills," "[c]ollaborative with other directors," "[c]ollaboration with other departments," "[t]horough observations of teachers," and "[c]ommunication with parents/community." Ex. YY to Joint Stmt. at C#99Montes.129626. Then she identified areas of growth: "[m]anagement of budget," due to several citations having been received in 2009; grant application improvement, to avoid having them returned for changes;[8] better staff management; improved task delegation, including "sharing information with schools"; and "[f]ollowing district procedures for workshops." *Id.* Mulattieri tasked Montes with determining the ELL program's priorities for the year, with Mulattieri already identifying the need for ELL placement data at Unity (one of the District's schools), learning how to upload data and ensure that Dziallo was kept informed if data was incorrect, and better tracking and sharing of the progress of students in the ELL program. Mulattieri also requested that Montes keep better account of expenditures and the ELL program's budget. Finally, Mulattieri stated: "There is a need to pull the department together and to organize. Each staff member must understand their role and complete tasks in a timely manner. Cross training must be in place. Information must be disseminated. Programs and activities to be evaluated." *Id.*

Over the next several months, Mulattieri observed Montes working on the items identified in the improvement plan. Dziallo helped train Montes on data entry to ensure there

---

[8] Jorge Nieves, a principal consultant for the ISBE who reviewed grants submitted by the District, testified that although he had a number of questions with respect to the grant submitted by Montes for the District, the amount of data missing or incorrectly designated within the grant application was not unusual for the size or level of the district and that the grant was ultimately approved. The 2010-2011 school year was the first year the District submitted the ISBE grant application electronically.

were no discrepancies between the District's recording method and the ISBE's system. Montes worked through the Christmas holiday to ensure the ELL data was accurate, thinking she had a deadline of January 2011 for that task. Although Dziallo admitted that data issues would persist regardless of the effort expended, he did tell Montes in February or March 2011 that the data was in "better shape" than ever. Ex. C to Joint Stmt. at 86:11–15. Adamic also admitted that the data had started to look better after Montes had worked on it.

In December 2010, Adamic determined that the entirety of the ELL program should be transferred to Dziallo's supervision. Around that time, Dziallo met with Montes and told her that her contract may not be renewed. Montes indicated that was the first time she was hearing the news. When Montes and Mulattieri spoke later that month, Mulattieri again informed Montes that the situation was serious and added that Dziallo did not see Montes' contract being renewed. Mulattieri subsequently resigned in protest. Although Dziallo had been discussed as Montes' new supervisor, Montes learned that Adamic would now be her ultimate supervisor. On January 3, 2011, Montes met with Adamic and Dziallo, discussing the improvement plan Mulattieri had put together in October, a department handbook Adamic wanted Montes to complete, and the ELL data. Adamic also recalls informing Montes during that meeting that if Montes' performance did not improve within sixty days, her contract would not be renewed.

Adamic and Dziallo evaluated Montes in March 2011. They evaluated her in the following six areas: facilitating a vision of learning; district culture and instructional program; management; collaboration with families and communities; acting with integrity, fairness, and in an ethical manner; and the political, social economics, and cultural context, and following ISBE regulations. Adamic and Dziallo rated Montes' overall performance as not meeting professional standards and did not recommend her for continued employment as an administrator with the

District.  Montes received an unsatisfactory rating for the category of "[a]nalyzes and interpret[s] educational data, issues, and trends[,] [u]nderstands the needs of the district, and seeks out resources to provide the necessary tools for all students."  Ex. N to Joint Stmt. at 1.  The review noted that Montes relied on others to clean up data and that data inconsistencies were found in the student databases.  Adamic complained that Montes would send error messages about ELL data to a school's principal asking the principal or ELL teacher to correct the information instead of correcting the information herself, although Adamic acknowledged that Montes' actions were not "inappropriate."  Ex. A to Joint Stmt. at 32:3–33:1.  But this was not an area identified in the improvement plan and Dziallo had earlier praised Montes for the accuracy of the data.

Adamic and Dziallo also rated Montes as unsatisfactory in framing, analyzing, and resolving problems using appropriate problem solving techniques and decisionmaking skills. Mulattieri testified that before she resigned, she did not find Montes to have any issues in this area.  Additionally, they found Montes' performance unsatisfactory in facilitating the design, implementation, and evaluation of curricular and other programs for continuous improvement. Adamic and Dziallo noted in the review that although Montes convened a committee to review materials, she did not clearly communicate with other administrators about the ELL program's mission.  They criticized Montes for not formally presenting a new ELL program (REACH) to the curriculum directors and supervisors despite having allocated money in a grant to that program.  Adamic believed that Montes was not prepared properly to implement the REACH program and was not able to justify the amount of training time that and other programs required. She thought Montes should have allotted more time to present REACH and appropriately test it before making a decision as to whether to pursue it.  Montes, however, testified that she had organized a new ELL program at the junior high level and that she had attempted to implement

additional programs but had been thwarted by Adamic. Mulattieri also recalled Montes convening a committee to discuss the REACH program, which Mulattieri then presented to curriculum directors in December 2010. Adamic exluded Montes from a meeting that Adamic called in January 2011 to discuss grant funding, where Montes testified she could have further discussed the program. Mulattieri also observed Montes collaborating with other administrators and program directors before pursuing curricular changes. Montes also was working on plans to expand a pilot project in the 2010-2011 school year, but that initiative ceased when Mulattieri left the District. REACH's publishing company made a presentation to teachers in April 2011, after Montes' evaluation.

Adamic and Dziallo also indicated in their evaluation that Montes had been asked to provide a plan for the ELL Department, with descriptions of the responsibilities of the program supervisors, and to create a procedures handbook, both tasks that Montes had not completed. Montes testified that she was working on the handbook with her staff and that she had submitted staff descriptions to Mulattieri, who provided them to Adamic.

The March 2011 evaluation also included criticism of Montes for relying on others for help with her expenditure reports even though she was in her third year as an ELL Director, a point in time when Adamic and Dziallo thought she should be training others. They noted that Montes "need[ed] to take more initiative in the responsibilities that she and her department handle," finding that she "lack[ed] self-direction" and "wait[ed] for others to tell her what she should be doing" instead of consistently exhibiting the leadership qualities required of a director. Ex. N to Joint Stmt. at 6. Although Adamic and Dziallo found Montes' collaborative approach to be a negative because they thought it showed a lack of initiative or decisiveness, Mulattieri considered it a positive because Montes was involving others in the process instead of dictating a

course of action. Montes also found that her ability to present programs was hindered by the direction to communicate through Mulattieri, who would present Montes' suggestions to the other administrators. Adamic and Dziallo also criticized Montes for not having determined which special education students needed ELL services, a project she was tasked with in September 2010, although Adamic admitted she did not know what the timeline was on the project. Montes testified that she worked with the special education director and other program supervisors in October 2010 to propose a program to address the special education students needing ELL services, but that Adamic did not approve their program, halting progress. Adamic and Dziallo disapproved of Montes asking the special education teachers to identify the students needing ELL services. But Montes claims she did not return the files provided to her by the special education department to that department without reaching a conclusion, although one of the ELL program supervisors, Leticia Saucedo, testified that the ELL program did not act on the documents provided to it.

When asked to describe Montes' performance, Mulattieri testified that her staff presentations and memos were "excellent," and that Montes was visible, approachable and involved with her program and the teachers at the various schools in the District. Ex. G to Joint Stmt. at 122:6–8. Even Dziallo described her as a "hard worker." Ex. C to Joint Stmt. at 131:2–3.

Montes' evaluation and Adamic and Dziallo's recommendation of non-renewal of her contract was presented to the District Board of Education (the "Board") at its March 10, 2011 meeting. The Board was the final decisionmaker for all contract renewal decisions. At the March 10 meeting, Montes provided Board Vice President Larry Polk with a packet of documents to rebut her evaluation. Polk did not read the documents but gave them to Adamic to

distribute to the remaining Board members.  Adamic forwarded the documents with a cover memo to the Board on March 16, noting that Montes knew about the change in her supervisors since October and including her own timeline of events that led up to Adamic and Dziallo's recommendation not to renew Montes' contract.  Adamic and Dziallo then discussed Montes' evaluation with the Board at its April 7 closed session meeting, indicating that they did not believe Montes was the proper leader for the ELL program and highlighting issues with ELL student data.  Although Montes had requested a hearing before the Board, instead of providing her with that hearing, the Board accepted the recommendation not to renew her contract at its April 7 meeting.  Polk could not recall another occasion where the Board had not approved a request for an employee to address the Board in a closed session about an employment situation. Polk testified that the Board members relied on Adamic's and Dziallo's recommendation in not renewing Montes' contract.  Another Board member, Larry Terracino, testified that the Board also took into consideration the recommendations of other assistant superintendents involved in the Board meeting, but he did not identify these individuals and no other assistant superintendents attended the April 7, 2011 closed session.

Ilyse Leland, who is not of Mexican national origin, replaced Montes as the ELL Director in July 2011.  Leland has a bachelor's degree in Near East Studies and a master's degree in instructional leadership, and holds administrative, early childhood, elementary, and high school certifications.  She also has ESL and bilingual education endorsements, and had previously worked in program administration for the Bellwood School District with responsibility for bilingual programs and was the ISBE's principal consultant in the ELL division from 2008 to 2010, monitoring school districts for grant compliance.  Before hiring Leland, however, the District had offered the ELL Director position to Diego Giraldo, who is Hispanic, but Giraldo

declined the position. After Leland assumed the ELL Director role, the District purchased the

REACH program for ELL students. As ELL Director, Leland communicated directly with

Adamic instead of working through a supervisor. Saucedo does not recall Leland completing an

ELL department handbook in the 2011-2012 or 2012-2013 academic years.

## LEGAL STANDARD

Summary judgment obviates the need for a trial where there is no genuine issue as to any

material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56.

To determine whether a genuine issue of fact exists, the Court must pierce the pleadings and

assess the proof as presented in depositions, answers to interrogatories, admissions, and

affidavits that are part of the record. Fed. R. Civ. P. 56 & advisory committee's notes. The party

seeking summary judgment bears the initial burden of proving that no genuine issue of material

fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265

(1986). In response, the non-moving party cannot rest on mere pleadings alone but must use the

evidentiary tools listed above to identify specific material facts that demonstrate a genuine issue

for trial. *Id.* at 324; *Insolia v. Philip Morris Inc.*, 216 F.3d 596, 598 (7th Cir. 2000). Although a

bare contention that an issue of fact exists is insufficient to create a factual dispute, *Bellaver v.

Quanex Corp.*, 200 F.3d 485, 492 (7th Cir. 2000), the Court must construe all facts in a light

most favorable to the non-moving party and draw all reasonable inferences in that party's favor.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

# ANALYSIS

## I.     National Origin and Associational National Origin Discrimination Claims (Count I)

Montes brings a claim against the District under Title VII for discrimination on the basis

of her national origin and her association with persons of her national origin.[9] A plaintiff

claiming national origin discrimination can prove her case under the direct or indirect method of

proof.[10] *Swanson v. Vill. of Flossmoor*, 794 F.3d 820, 825 (7th Cir. 2015).  Montes proceeds

only under the indirect method of proof set out in *McDonnell Douglas Corp. v. Green*, 411 U.S.

792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973), thus, the Court will not analyze her claim under the

direct method.  Under the indirect method, Montes must show that (1) she is a member of a

protected class, (2) she was meeting the District's legitimate expectations, (3) she suffered an

adverse employment action, and (4) similarly situated employees outside of her protected class

were treated more favorably.  *Naficy v. Illinois Dep't of Human Servs.*, 697 F.3d 504, 511 (7th

Cir. 2012).  If Montes establishes a *prima facie* case, the District must present evidence showing

a legitimate, nondiscriminatory reason for the employment action.  *Id.*  Montes must then present

evidence showing that the District's stated reason is pretextual.  *Id.* at 511–12.

The District does not contest the first or third elements of Montes' *prima facie* case,

acknowledging that she is of Mexican national origin and that her employment agreement with

the District was not renewed for the 2011-2012 academic year.  But the District argues that

---

[9] Montes argues that the District only moved for summary judgment with respect to her national origin claim, omitting mention of her associational national origin discrimination claim.  Both claims were included in Count I of her amended complaint, on which the District moved for summary judgment.  *See* Doc. 134 at 2; Doc. 10 at 3–12.  Because the Court fails to see a distinction in the proof required for these claims, as Montes proceeds under the indirect method on both claims, the Court analyzes the claims together.

[10] The Seventh Circuit has questioned the continued utility of the direct and indirect methods of proof but has continued to analyze Title VII discrimination claims separately under these methods and so the Court will do the same.  *See Simpson v. Beaver Dam Cmty. Hosps., Inc.*, 780 F.3d 784, 789–90 (7th Cir. 2015).

Montes cannot establish that she was meeting the District's legitimate expectations or that the District treated similarly situated employees not of Mexican national origin more favorably. The District also argues that even if there are questions of fact surrounding Montes' *prima facie* case, Montes cannot show that the District's stated reasons for not renewing her contract were pretext for discrimination.

Unfortunately, the Court's analysis is not linear, as there is significant overlap that arises from the parties' presentation of the issues.[11] The legitimate expectations prong of Montes' *prima facie* case and the pretext question overlap here, as the District asserts that it did not renew Montes' contract because she was not meeting the legitimate job expectations it had for the ELL Director. *See Everroad v. Scott Truck Sys., Inc.*, 604 F.3d 471, 477–78 (7th Cir. 2010) ("When the employer asserts as the nondiscriminatory reason for termination that the employee was not meeting legitimate job expectations, the credibility of the employer's assertion is at issue for both the second element of the plaintiff's *prima facie* case and the pretext analysis."). Thus, the Court will combine its analysis of these questions and first address the fourth element of Montes' *prima facie* case, whether she has provided evidence of similarly situated individuals.

A.     **Similarly Situated Employees**

The District claims that Montes cannot show that she was similarly situated to other program directors not in her protected class who were treated more favorably. To show that an employee is similarly situated, Montes must demonstrate that the employee "(1) dealt with the same supervisor, (2)[was] subject to the same standards, and (3) engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Coleman v. Donahoe*, 667 F.3d 835, 847 (7th Cir. 2012)

---

[11] The Court has done its best to make sense of the parties' arguments and determine whether Montes has presented sufficient evidence to proceed in accordance with existing Supreme Court and Seventh Circuit case law, despite the lack of relevant legal argument and citations from the parties.

(citation omitted) (internal quotation marks omitted).  A precise comparison is not required, however.  *Harper v. C.R. England, Inc.*, 687 F.3d 297, 309 (7th Cir. 2012) ("A similarly situated employee need not be in a situation identical to that of the plaintiff.").  Alternatively, the similarly situated inquiry can merge with the legitimate expectations prong of a plaintiff's *prima facie* case if there is evidence that the employer applied its legitimate job expectations in a disparate manner (i.e. that the District had two sets of employment expectations, one for Mexican employees and one for non-Mexicans).  *Peele v. Country Mut. Ins. Co.*, 288 F.3d 319, 329 (7th Cir. 2002) ("When a plaintiff produces evidence sufficient to raise an inference that an employer applied its legitimate employment expectations in a disparate manner (i.e., applied expectations to similarly situated male and younger employees in a more favorable manner), the second and fourth prongs of *McDonnell Douglas* merge—allowing the plaintiff to establish a *prima facie* case, stave off summary judgment for the time being, and proceed to the pretext inquiry.").  Finally, in the termination context, the Seventh Circuit has held that, where the plaintiff has raised an issue of material fact that she was meeting the employer's legitimate expectations, the fourth prong of the *prima facie* case may be met by showing that "the employer needs to find another person to perform that job after the employee is gone."  *Pantoja v. Am. NTN Bearing Mfg. Corp.*, 495 F.3d 840, 846 (7th Cir. 2007).

Montes' brief is less than clear as to which avenue she is pursuing to establish this element.  She names other program directors in the District who were supervised by Mulattieri during the 2010-2011 academic year until Mulattieri's resignation, indicating that they were all not of Mexican origin.  Montes claims that these program directors engaged in similar conduct to her, should have been subject to the same standards as she, but were not subject to the same consequences.  But she provides nothing to support her conclusory statements regarding the

conduct in which they engaged, the standards to which they were held, or even to establish that they all had their contracts renewed for the following year. These program directors' reviews for the 2010-2011 academic year are not in the record, nor does the record include any other admissible evidence of their evaluations, job expectations, or treatment by Adamic or Dziallo at the relevant time (i.e. after Mulattieri left), leaving the Court without a basis to compare the District's evaluation of their performance to that of Montes, at least as it would relate to whether they engaged in comparable conduct and were disciplined differently.[12] *See Zayas v. Rockford Mem'l Hosp.*, 740 F.3d 1154, 1158 (7th Cir. 2014) ("broad conclusions" about other ultrasound technicians not sufficient to satisfy similarly situated prong); *Gates v. Caterpillar, Inc.*, 513 F.3d 680, 690 (7th Cir. 2008) (plaintiff's limited information on comparators was "too vague to allow this Court to determine whether Gates and the men are 'similarly situated'"); *South v. Illinois Envtl. Prot. Agency*, 495 F.3d 747, 753 (7th Cir. 2007) (plaintiff failed to identify similarly situated employees for even though he identified individuals with the same employment responsibilities and supervisor, he did not present information as to other "salient characteristics" that would allow a trier of fact to determine that they were treated differently by the employer); *Marich v. Sch. Town of Munster, Indiana*, No. 2:11-cv-96, 2015 WL 1865549, at *9–10 (N.D. Ind. Apr. 23, 2015) (court could not find that similarly situated employee was treated more favorably where plaintiff did not provide evidence that other employees had any of the issues that plaintiff's supervisor identified with plaintiff's performance).

---

[12] Montes has proffered Mulattieri's affidavit, in which she states that of the program directors she supervised in the 2010-2011 academic year, Montes was the only director given a performance plan, the only one given a clerical project, the only one to have a change in her direct supervisor prior to Mulattieri's resignation, and the only one to face interference from Adamic and Dziallo. But this does not allow the Court to determine whether any of these program directors received similar performance evaluations or were found to have engaged in similar conduct but had their contracts renewed by the Board.

Alternatively, Montes could be arguing that the District's expectations of her were inherently discriminatory, contending that, as the only program director of Mexican national origin, she was subjected to different expectations in the 2010-2011 academic year than the other program directors in the District. Here, Mulattieri's affidavit, attesting that Montes was the only director under her supervision to be given certain responsibilities and goals furthers Montes' argument, as it could create a question of fact as to whether the District subjected Montes to higher standards than other similarly situated program directors who were not of Mexican national origin. The District does not specifically respond to Mulattieri's statements regarding these other directors,[13] suggesting that these other directors did not face heightened expectations during the 2010-2011 school year.

Montes' most promising argument relies on the Court finding that she was meeting the District's legitimate expectations (or at least that she has raised an issue of fact on that question). If that is the case, under *Pantoja*, she could meet the similarly situated prong of her *prima facie* case by showing that the District replaced her. *Pantoja*, 495 F.3d at 846. Indeed, Montes points to her replacement, Ilyse Leland, who is not of Mexican national origin, as a comparator, suggesting that Leland was less qualified yet received more favorable treatment and professional respect than Montes in the same position. Because this relaxed requirement for the similarly situated prong applies only where Montes demonstrates an issue of fact on whether she was meeting the District's legitimate expectations, *see Naik v. Boehringer Ingelheim Pharm., Inc.*,

---

[13] This may be because they are contained in Mulattieri's affidavit and Montes' response to the District's motion for summary judgment, and not set forth as individual statements in Montes' statement of additional facts. Nonetheless, because they were incorporated into Montes' response, with appropriate citation to Mulattieri's affidavit, the Court finds that these facts have been appropriately presented for the Court's consideration. *See* Judge Sara L. Ellis, Summary Judgment Case Management Procedure ("[T]he non-moving party may include facts in its response to the motion for summary judgment that it contends are disputed in order to demonstrate that a genuine issue of material fact exists that warrants denying the motion for summary judgment. The non-moving party must include citations to supporting material supporting the dispute and attach the same. The moving party may respond to these facts in its reply.").

627 F.3d 596, 600–01 (7th Cir. 2010), the Court will proceed to its combined inquiry of legitimate expectations and pretext.

**B.       Legitimate Expectations/Pretext**

The District argues that Montes cannot show that her job performance met its legitimate expectations or that the District's proffered reason for her termination—her inadequate performance as the ELL director—is a pretext for discrimination. As discussed above, because both issues turn on whether the District is not truthful about Montes' job performance, the Court addresses the second element of Montes' *prima* face case and the pretext question together. *See Everroad*, 604 F.3d at 477–78.

To establish pretext, Montes must demonstrate that "(a) the employer's nondiscriminatory reason was dishonest; and (b) the employer's true reason was based on a discriminatory intent." *E.E.O.C. v. Target Corp.*, 460 F.3d 946, 960 (7th Cir. 2006). "A plaintiff shows that a reason is pretextual 'directly by persuading the court that a discriminatory reason more likely motivated the defendants or indirectly by showing that the defendants' proffered explanation is unworthy of credence.'" *Blise v. Antaramian*, 409 F.3d 861, 867 (7th Cir. 2005) (brackets omitted) (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981)). In determining whether an employer's explanation is honest, courts look to the reasonableness of the explanation. *See Duncan v. Fleetwood Motor Homes of Indiana, Inc.*, 518 F.3d 486, 492 (7th Cir. 2008); *Stewart v. Henderson*, 207 F.3d 374, 378 (7th Cir. 2000) ("The focus of a pretext inquiry is whether the employer's stated reason was honest, not whether it was accurate, wise or well-considered.").

The District presents a detailed list of Montes' shortcomings as ELL Director, to which Montes responds with a similarly detailed rebuttal. Although the relevant inquiry is her

performance at the time of her evaluation, because that evaluation spanned the entire 2010-2011 academic year, Mulattieri's evaluation of her performance during the time she worked for the District in that year remains relevant. *See Peele*, 288 F.3d at 329 ("[T]he issue is not the employee's past performance but 'whether the employee was performing well at the time of [her] termination.'" (second alteration in original) (quoting *Karazanos v. Navistar Int'l Transp. Corp.*, 948 F.2d 332, 336 (7th Cir. 1991))); *see also Zayas*, 740 F.3d at 1158 ("The question is not whether she *ever* satisfied the Hospital's expectations, but whether she met the Hospital's expectations *at the time she was fired*."); *Truesdale v. Maine Twp. High Sch. Dist. No. 207*, No. 04 C 7132, 2006 WL 2375469, at *9 (N.D. Ill. Aug. 14, 2006) (noting that expectations must be considered at time of discharge because the "quality of an employee's performance may change over time" and "the people who evaluate that performance may change as well"). Montes' two prior performance reviews are not wholly irrelevant, although they cannot on their own create an issue of fact as to the adequacy of her performance. *See Fortier v. Ameritech Mobile Commc'ns*, 161 F.3d 1106, 1113 (7th Cir. 1998) ("[E]arlier evaluations cannot, by themselves, demonstrate the adequacy of performance at the crucial time when the employment action is taken. Nor can such evaluations, standing alone, create a genuine issue of triable fact when, as here, there have been substantial alterations in the employee's responsibilities and supervision in the intervening period." (citations omitted)).

Montes relies heavily on her own and Mulattieri's evaluation of her performance to rebut Adamic and Dziallo's March 2011 performance evaluation to create a question of fact as to whether she was meeting the District's legitimate expectations and whether the reason given for the non-renewal of her contract was pretext for discrimination. A plaintiff's own evaluation of her work is generally not enough to avoid summary judgment. *See Dickerson v. Bd. of Trs. of*

*Cmty. Coll. Dist. No. 522*, 657 F.3d 595, 603 (7th Cir. 2011) (plaintiff's "own evaluation of his work cannot be imputed to [the employer], and is insufficient to permit his case to survive past summary judgment"); *Silverman v. Bd. of Educ. of City of Chicago*, 637 F.3d 729, 738 (7th Cir. 2011) (noting that if employee's disagreements with employer's negative assessment of employee's performance "were enough to avoid summary judgment and go to trial on an indirect proof case, summary judgment would become extinct and employer's evaluations would be supplanted by federal juries' evaluations"). Additionally, general co-worker or supervisor statements that merely support a plaintiff's view of her job performance are typically given little weight. *Peele*, 288 F.3d at 329. But an employee's own statements in rebuttal may be considered if they "raise a genuine issue about the honesty, not merely the accuracy, of the employer's stated evaluation." *Silverman*, 637 F.3d at 738. More specifically, "[a]lthough general averments of adequate performance are insufficient to create a factual issue on summary judgment even when corroborated by statements of supervisors or co-workers, a plaintiff may create an issue of fact by specifically refuting facts that allegedly support the employer's claim of performance deficiencies." *Dey v. Colt Constr. & Dev. Co.*, 28 F.3d 1446, 1460 (7th Cir. 1994).

Here, Montes, with Mulattieri's assistance, has provided a detailed refutation of the District's assessment of her negative performance as ELL director. She also points to comments made by Adamic and Dziallo that undermine some of the performance deficiencies they themselves identified. For example, she notes that Dziallo stated that the ELL data was the cleanest it had ever been even though he cited her for unsatisfactory performance with respect to the ELL data in her evaluation that same month. "A detailed refutation of events which underlie the employer's negative performance assessment demonstrates that the employer may not have

honestly relied on the identified deficiencies in making its decision." *Dey*, 28 F.3d at 1460–61. Montes has provided just such a detailed refutation, challenging the veracity of Adamic and Dziallo's evaluation, and the reasons given by the District in its summary judgment motion for not renewing her contract, instead of relying on general statements that her performance was satisfactory. *Cf. Burks v. Wisconsin Dep't of Transp.*, 464 F.3d 744, 752 n.6 (7th Cir. 2006) (distinguishing *Dey* and noting that in the case before the court, the plaintiff had not offered any evidence that specific events had not occurred, instead only that a co-worker did not perceive any problems with the plaintiff's performance). Although the District disputes that Montes' rebuttals of her March 2011 evaluation are valid, determining their validity is not the province of the Court but rather of a jury. Thus, the Court finds a material issue of fact as to whether Montes was meeting the District's legitimate expectations and whether its reasons for not renewing her contract were pretextual. *See Bob-Maunuel v. Chipotle Mexican Grill, Inc.*, 10 F. Supp. 3d 854, 877 (N.D. Ill. 2014) (plaintiff provided evidence that went "beyond general assertions of adequate job performance and directly address[ed] the specific performance deficiencies identified by Defendant" so as to "raise a factual issue as to whether Defendant's justifications for terminating him are credible or merely a pretext for discrimination"); *Rein v. Quincy Pub. Sch. Dist. #172*, No. 11-3425, 2014 WL 538349, at *9–10 (C.D. Ill. Feb. 11, 2014) (plaintiff's rebuttal of evaluation, in addition to affidavits from colleagues, created genuine issue of fact on performance question).

## C.    Cat's Paw

The District argues that summary judgment is nonetheless appropriate because the ultimate decisionmaker in this case was the Board, and not Adamic and Dziallo, and so it is irrelevant if Adamic and Dziallo may have acted with discriminatory animus. Montes responds

that she can succeed under the cat's paw theory, which allows an employer to be held liable where "a non-decision-making employee with discriminatory animus provided factual information or input that may have affected the adverse employment action." *Matthews v. Waukesha County*, 759 F.3d 821, 829 (7th Cir. 2014); *Smith v. Bray*, 681 F.3d 888, 900 (7th Cir. 2012) ("Our decisions teach that when a subordinate harbors a discriminatory animus and advises the ultimate decision-maker to take an adverse action against the plaintiff, that evidence can support a claim against the corporate employer.").  Although the Board did make the final decision not to renew Montes' contract, Montes has provided evidence that the Board's decision was based on Adamic and Dziallo's recommendation.  One of the Board members, Polk, testified that he did not read any of Montes' rebuttal documents before voting not to renew her employment contract.  The Board also denied Montes' request for a hearing, denying her the ability to present her position to the Board.  The District cites to evidence suggesting that the Board also conducted its own review, discussing Montes' prior evaluations and relying on testimony of other assistant superintendents (although the District does not provide the identity of these other assistant superintendents and acknowledges that Adamic and Dziallo were the only non-Board members at the meeting discussing Montes' non-renewal).  But it is not clear from the facts in the record whether the Board's determined that non-renewal was entirely justified apart from Adamic and Dziallo's recommendation, with the evidence not being sufficient to suggest that the Board conducted an entirely independent investigation so as to break the chain of causation.  *See Woods v. City of Berwyn*, No. 13-3766, slip op. at 9 (7th Cir. Oct. 15, 2015).  Because there is at least a question of fact on the issue of whether Adamic and Dziallo were substantially involved in the decisionmaking process so that the cat's paw theory applies, it must be submitted to the jury.  *See Smith*, 681 F.3d at 900 (finding question of fact as to whether

supervisor provided input that contributed to plaintiff's termination where she was "substantially involved at every stage of his workplace controversies" and wrote the report requesting termination); *Goswami v. DePaul Univ.*, No. 12 C 7167, 2015 WL 251304, at *15 (N.D. Ill. Jan. 20, 2015) (leaving it to the jury to determine whether plaintiff's cat's paw theory is persuasive); *cf. Woods*, slip op. at 9–13 (cat's paw theory did not apply where Board held full-scale, adversarial hearing into charges against plaintiff where plaintiff was represented by counsel and presented witnesses and Board made independent decision to terminate plaintiff based on testimony of witness who did not harbor discriminatory animus, breaking the chain of causation). Thus, summary judgment is denied on Montes' national origin and associational national origin discrimination claim.

## II.     Intentional Interference with Business Expectancy (Count II)

Montes also brings a claim against Adamic and Dziallo for intentional interference with business expectancy, also known as tortious interference with prospective economic advantage. To prevail on this claim, Montes must establish: (1) a reasonable expectation of entering a valid business relationship, (2) Adamic and Dziallo's knowledge of that expectation, (3) Adamic and Dziallo's purposeful interference that prevented Montes' legitimate expectation from becoming a valid business relationship, and (4) damages resulting from their interference. *Atanus v. Am. Airlines, Inc.*, 932 N.E.2d 1044, 1048, 403 Ill. App. 3d 549, 342 Ill. Dec. 583 (2010).

Adamic and Dziallo argue that Montes cannot establish any of the elements of this claim, but the Court need only address the first. They argue Montes did not have a sufficient expectation of continued employment with the District, as she had a year-to-year contract, not tenure, and knew it was possible that her contract would not be renewed at least as of December 2010. They also maintain that her previous contract renewals did not create a right to future

employment with the District. Illinois courts have held that an individual employed under a renewable contract does not enjoy a sufficient expectancy of continued employment so as to sustain a claim for tortious interference with business expectancy, for "the mere hope of continued employment, without more, does not . . . constitute a *reasonable* expectancy." *Williams v. Weaver*, 495 N.E.2d 1147, 1152, 145 Ill. App. 3d 562, 99 Ill. Dec. 412 (1986); *see also Werblood v. Columbia Coll.*, 536 N.E.2d 750, 755–56, 180 Ill. App. 3d 967, 129 Ill. Dec. 700 (1989) (plaintiff's expectation that her employment contract would be renewed was not sufficient to support a cause of action for intentional interference with prospective economic advantage, even where officials had assured her that her employment was secure); *Goswami v. DePaul Univ.*, No. 12 C 7167, 2014 WL 125600, at *6–7 (N.D. Ill. Jan. 14, 2014) (plaintiff did not have reasonable expectancy of contract being renewed and being granted tenure even where she had consistent excellent reviews and no reports of deficient performance); *Robinson v. Sabis Educ. Sys., Inc.*, No. 98 C 4251, 1999 WL 414262, at *14 (N.D. Ill. June 4, 1999) (plaintiff only had at-will employment relationship and so could not pursue tortious interference claim against school employees who influenced her termination). Montes cites to her prior positive reviews and the improvement plan as evidence that she had a reasonable expectation of continued employment. But Montes was on a year-to-year contract and had been informed several times that her contract might not be renewed. This differentiates her from the at-will employee in *James v. Intercontinental Hotels Group Resources, Inc.*, who was found to have a reasonable expectancy of continued employment based on an exemplary work record and previous promotions. No. 09-cv-781, 2010 WL 529444, at *4–5 (N.D. Ill. Feb. 10, 2010) (allowing claim to go forward at motion to dismiss stage). Because Montes' expectation of continued employment was unfounded, her tortious interference claim fails on the first element and

judgment is entered for Adamic and Dziallo.[14]  *Werblood*, 536 N.E.2d at 755–56; *Goswami*,

2014 WL 125600, at *6–7; *Robinson*, 1999 WL 414262, at *14.

## CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment [134] is granted in

part and denied in part.  Summary judgment is granted in favor of Donna Adamic and Michael

Dziallo on Montes' intentional interference with business expectancy claim (Count II).

Summary judgment is denied on Montes' national origin and associational national origin

discrimination claim (Count I).


Dated: October 20, 2015

SARA L. ELLIS
United States District Judge

---

[14] Because the Court finds Montes cannot succeed on the first element, it need not address the other elements.  The Court notes that it seems unlikely that Montes could show that Adamic and Dziallo took "some wrongful action, directed at a third party, to induce the third party not to do business with" Montes, as Adamic and Dziallo are considered agents of the District.  *Gorgonz Grp., Inc. v. Marmon Holdings, Inc.*, No. 00 C 2292, 2001 WL 103406, at *3 (N.D. Ill. Jan. 30, 2001) (citation omitted) (internal quotation marks omitted); *Quist v. Bd. of Trs. of Cmty. Coll. Dist. No. 525*, 629 N.E.2d 807, 811–12, 258 Ill. App. 3d 814, 196 Ill. Dec. 262 (1994) (rejecting tortious interference with prospective contractual relationship claim where plaintiff charged that president of defendant college "made a statement allegedly threatening to her future employability," as the president was an agent of her employer and thus she was claiming interference by the defendant and not by a third party).  Montes argues, however, that Adamic and Dziallo were acting in their own interests and thus outside the scope of their employment.  *See Citylink Grp., Ltd. v. Hyatt Corp.*, 729 N.E.2d 869, 877, 313 Ill. App. 3d 829, 246 Ill. Dec. 218 (2000) ("Corporate officers, directors, shareholders and agents are normally privileged against claims that their activities interfered in a third party's relationships with their principals.  To overcome the privilege, plaintiffs must allege or prove that a defendant acted in its own interests and contrary to the interests of its principal, or engage in conduct totally unrelated or antagonistic to the interest giving rise to the privilege." (citation omitted)).  Such an argument would appear to be inconsistent with Montes' cat's paw theory on her discrimination claims.